IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| THOMAS B.,<br><br>Plaintiff,<br>v.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:25CV1057 |

**ORDER AND MEMORANDUM OPINION**
**OF UNITED STATES MAGISTRATE JUDGE**

The plaintiff, Thomas B. ("Thomas"), has sought review of a final decision of the Commissioner of Social Security denying his claim for supplemental security income.[1] The Court has considered the certified administrative record and dispositive briefs from each party. Because substantial evidence supports the determination of the Administrative Law Judge ("ALJ"), the Court will deny Thomas' request for the award of benefits or for a remand, as set forth below.

I. PROCEDURAL HISTORY

Thomas filed an application for supplemental security income in October of 2023, alleging a disability onset date of September 30, 2019, later amended to September 26, 2023. (Tr. 190-96, 17, 42.) The application was denied initially and upon reconsideration. (Tr. 130-34, 136-39.) After a hearing, the ALJ determined on December 27, 2024, that Thomas was not disabled under the Act. (Tr. 17-64.) The Appeals Council denied a request for review, making the ALJ's decision the final decision for review. (Tr. 1-6.)

II. STANDARD OF REVIEW

While Section 405(g) of Title 42 of the United States Code "authorizes judicial review of the Social Security Commissioner's denial of social security benefits," *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006), the scope of that review is specific and narrow, *see Smith v. Schweiker*, 795 F.2d 343, 345 (4th

[1] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer. *See* Docket Entry 4. By Order of Reference, this matter was referred to the Undersigned to conduct all proceedings in this case pursuant to 28 U.S.C. § 636(c). *See* Docket Entry 8.

Cir. 1986). Specifically, review is limited to determining if there is substantial evidence in the record to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Put simply: the issue before the Court is not whether Thomas is disabled but whether substantial evidence supports the finding that he is not, based upon a correct application of the relevant law. *Id.*

III. THE ALJ'S DECISION

The ALJ followed the correct process, set forth in 20 C.F.R. § 416.920, to determine disability. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999).

"The Commissioner uses a five-step process to evaluate disability claims." *Hancock v. Astrue*, 667 F.3d 470, 472-73 (4th Cir. 2012) (citing 20 C.F.R. §§ 416.920(a)(4), 404.1520(a)(4)).

> Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her [or his] past relevant work; and (5) if not, could perform any other work in the national economy.

*Id.* at 472. A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. *Id.* at 473. "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the Secretary to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education, and work experience." *Hunter*, 993 F.2d at 35 (internal citations omitted).

The ALJ determined at step one that Thomas had not engaged in substantial gainful activity since the amended alleged onset date of September 26, 2023. (Tr. 20.) The ALJ next found the following severe impairments at step two: "right shoulder disorder, spine disorder, left knee disorder, peripheral polyneuropathy, migraines, major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder (PTSD)." (Tr. 20.) At step three, the ALJ found that Thomas did not have an impairment

or combination of impairments listed in, or medically equal to one listed in, Appendix 1. (Tr. 20.)

The ALJ next set forth Thomas' Residual Functional Capacity ("RFC") and determined that he could perform light work with the following additional limitations:

> (1) no climbing of ladders, ropes or scaffolds, (2) occasional climbing of ramps or stairs, (3) occasional stooping, balancing, crouching, kneeling or crawling, (4) frequent pushing, pulling, reaching and handling with the dominant right upper extremity, (5) no exposure to dangerous hazards, such as unprotected heights or dangerous machinery, (6) the claimant can understand, remember and carry out simple instructions for 2 hour intervals over an 8-hour workday, but not at a production rate pace, such as a strict, hourly production quota.

(Tr. 22.)

At the fourth step, the ALJ determined that Thomas had no past relevant work. (Tr. 27.) Last, at step five, the ALJ concluded that there were other jobs in the national economy that Thomas could perform. (Tr. 28.)

## IV. DISCUSSION

Thomas contends that "[t]he ALJ erred by failing to apply the correct legal standards when evaluating [his] allegations of pain." Docket Entry 11 at 5. Second, Thomas contends that "[t]he ALJ erred by failing to adequately account for the vocationally limiting effects of [his] chronic migraine headaches in the RFC determination." *Id.* at 9. Third, Thomas contends that "[t]he ALJ erred by failing to explain what the term 'production rate pace' means in the RFC assessment." *Id.* at 15. As explained below, none of these objections warrant relief.

### A. Standard for the RFC Determination.

The RFC measures the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairments and any related symptoms (e.g., pain). *See* 20 C.F.R. § 416.945; *see also Dunn v. Colvin*, 607 Fed. App'x 264, 272 (4th Cir. 2015) (unpublished) (claimant's RFC is "[a] medical assessment of what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)") (internal citation omitted); *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006). The RFC includes both a "physical exertional or strength

limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory or skin impairments)." *Hall v. Harris*, 658 F.2d 260, 265 (4th Cir. 1981).

"Social Security Ruling 96-8p explains that the RFC 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (internal quotations omitted). An ALJ need not discuss every piece of evidence in making an RFC determination. *See Reid v. Comm. of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Yet, the ALJ "must build an accurate and logical bridge from the evidence to [the] conclusion." *Brown v. Commissioner*, 873 F.3d 251, 269 (4th Cir. 2017). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only [then] may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1.

The Fourth Circuit has held that "meaningful review is frustrated when an ALJ goes straight from listing the evidence to stating a conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) (explaining that "a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion"). The ALJ "must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (alteration in original) (quoting *Monroe*, 826 F.3d at 189). An ALJ's failure to do so constitutes reversible error. *See Lewis v. Berryhill*, 858 F.3d 858, 868 (4th Cir. 2017). Where an ALJ's "analysis is incomplete and precludes meaningful review," remand is appropriate. *Monroe*, 826 F.3d at 191.

Moreover, "[a]n ALJ assesses the credibility of a claimant's subjective statements about his condition as part of the RFC assessment," *Ladda v. Berryhill*, 749 F. App'x 166, 170 (4th Cir. 2018) (unpublished), using a two-part test: "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged,'" *Craig*, 76 F.3d at 594 (citing 20 C.F.R. §§ 416.929(b), 404.1529(b)).

If such an impairment exists, the ALJ

must then consider, as the second prong of the test, all available evidence, including the claimant's statements about pain, to determine whether the claimant is disabled. *Id.* at 595-96. In so doing, the ALJ need not credit them if they conflict with the objective medical evidence or if the underlying impairment could not reasonably be expected to cause the symptoms alleged. *Id.* Where the ALJ has considered the relevant factors, *see* 20 C.F.R. § 416.929(c)(3), and heard the claimant's testimony and observed his or her demeanor, the Court will defer to the ALJ's determination regarding those subjective complaints. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Those relevant factors include:

(i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate his pain or other symptoms;

(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of his pain or other symptoms;

(vi) Any measures [Plaintiff] use[s] or [has] used to relieve his pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

Last, SSR 19-4p also provides guidance on how to evaluate primary headache disorders, such as migraines, in disability claims. *See* SSR 19-4p, 2019 WL 4169635 at *2. The ruling notes that regulations require medically determinable impairments be established by objective medical evidence from an acceptable medical source; "a person's statement of symptoms, a diagnosis, or a medical opinion" will not be used to establish the existence of a medically determinable impairment; and a finding of disability will not be made "based on a person's statement of symptoms alone." *Id.* The ruling indicates that a

primary headache disorder is established as a medically determinable impairment "by considering objective medical evidence (signs, laboratory findings, or both)" from an acceptable medical source. *Id.* at *5. The ruling also notes that "the extent to which the person's impairment-related symptoms are consistent with the evidence of record" will be considered and that "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC." *Id.* at *8.

B. The ALJ's Subjective Complaints Analysis Is Correct and Well Supported.

First, Thomas challenges the ALJ's assessment of his subjective complaints. Docket Entry 11 at 5. As explained in greater detail below, this objection has no merit.

Here, the ALJ began his subjective complaints assessment by summarizing Thomas's allegations as follows:

> The claimant alleges that he is unable to perform any work because of chronic pain, migraines, high blood pressure, sleep apnea, acid reflux, depression, anxiety, and PTSD (B1E/2). He states that he cannot lift more than 10-20 pounds, he gets migraines two to three times each week, he cannot sit, stand, or walk for extended periods, and he has difficulty with nearly all postural activities (B11E/1, 6).
>
> The claimant testified at the hearing that he currently lives by himself in a double-wide trailer. He drives to the store, to church on Sunday, and to his medical appointments. He last worked in 2019. In 2020, he was injured when he was hit by a FedEx van. He was injured again in July of this year when he was involved in a motorcycle accident, but he has recovered from those injuries. In January, he is planning to have surgery on the top of his neck, and he anticipates that he will also need surgery on his lower back. He has difficulty using his right shoulder and cannot really move his right arm above his head. He also has pain and stiffness in his left knee. He elevates his legs about two feet high to take the stress off his back, and he often lays down during the day. He takes ibuprofen for pain. The claimant stated that he can lift approximately 10 pounds, stand for 20 minutes, walk for 15-20 minutes, and sit for 15-20 minutes at a time. He has difficulty holding his head up while sitting due to muscle spasms in his neck. He experiences frequent

> migraines, which typically come in clusters. He can go a week or two with no headaches, and then will have multiple migraines. The migraines last for about an hour if he takes medication. He does not take medication for mental health conditions, and he is not currently in therapy. He was previously seeing a psychiatrist, but he has not found a new one yet. When he was taking his medications, he was getting panic attacks approximately once a month. Now, he has panic attacks every week or two. He does not believe he could do a sit-down job, due to trouble holding his head up for long periods. Straightening up after bending down is also painful. He cannot twist to look over his right shoulder due to loss of range of motion. He has tremors and spasms in his hands, and he sometimes drops objects. He often has numbness and tingling in his right hand and uses a tool to grab things, so he does not have to bend over. When he attends church, he sits in the back so he can get up two or three times during the 45-minute service. He does some laundry but spends most of his time sitting around watching television and relaxing with his family.

(Tr. 23.)

Next, the ALJ completed the two-step *Craig* analysis. First, the ALJ stated that he had carefully considered the evidence and found that Thomas' "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 23.) The ALJ therefore discharged his duty under the first step of the *Craig* analysis. Second, at step two of the *Craig* analysis, the ALJ decided that Thomas' "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 23.) The ALJ then set forth a number of good reasons, for partially discounting his assertions.

First, the ALJ explained why the medical evidence did not fully support Thomas' extreme allegations. (Tr. 23-27.) Specifically, the ALJ acknowledged that Thomas "experienced significant injuries from his accidents" but observed that he "had limited medical treatment for his musculoskeletal issues during the period that he [was] alleging disability." (Tr. 26.) He received chiropractic care, and he reported that he "had previously stopped taking his medications and that he 'feels better overall' when he is off his medications." (Tr. 24, 2882.) *See Dunn*, 607 Fed. App' x at 275 ("[I]f all that the claimant needs is

conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is.").

Second, the ALJ further noted that Thomas "generally exhibit[ed] normal muscle strength, intact sensation, and a normal gait in his physical examinations." (Tr. 26, 575 (9/11/2023), 1387 (2/3/2024), 2802-03 (8/1/2024), 1587 (7/30/2024), 1828 (6/3/2021), 1861, 1869, 1888 (6/10/2021), 2703-04 (8/29/2024).) And the ALJ explained that during a February 2024 consultative examination, Thomas "had normal range of motion, and he had a normal gait, normal muscle tone, normal sensation, and showed full 5/5 strength in all muscle groups." (Tr. 25, 1387-90.) "He had no difficulty getting on or off the examination table, he was able to lift and carry light objects, he had a normal ability to walk on heels and toes and tandem walk, he could squat and rise 'with ease,' and he could pinch, grasp, and manipulate small objects without difficulty." (Tr. 25, 1388.)

Third, besides Thomas' treatment history and examination findings, the ALJ relied on the prior administrative medical findings and medical opinion evidence when evaluating his subjective pain allegations. (Tr. 26-27.) *See* 20 C.F.R. § 416.929(c)(3) (explaining that the ALJ will consider prior administrative medical findings and medical opinions about the nature and severity of the claimant's impairments and related symptoms, including pain, when assessing the claimant's subjective complaints). As the ALJ discussed, after evaluating Thomas and considering his allegations of chronic back pain and other symptoms, consultative examiner Catherine Conrad, FNP-C, found that he had no limitations in sitting, standing, or walking. (Tr. 26, 1391-92.) Similarly, state agency medical experts J. Wesley Johnson, M.D., and Howard Stein, M.D., considered the relevant evidence, including Thomas's subjective statements, and found that he could perform a reduced range of medium work. (Tr. 26, 107-08, 120-21.)

Fourth, the ALJ explained that Thomas' "level of activity" suggested his "impairments may not be as debilitating as he alleges." (Tr. 26). *See* 20 C.F.R. § 416.929(c)(3)(i) (daily activities are a relevant consideration when assessing the claimant's symptoms). As the ALJ discussed, Thomas "continued to perform a number of activities that are consistent with basic work functions such as making simple meals, doing light housework and laundry, going out alone, driving a car, going shopping, managing his finances, and attending his appointments." (Tr. 26, 316-17, 43.) Moreover, Thomas rode a motorcycle (Tr. 24, 1584), tried to "lift a tree limb" (Tr. 24, 2802), exercised by walking for 30 minutes twice a week (Tr. 574), and told the

consultative examiner that he performed activities of daily living independently (Tr. 1391). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (concluding that the ALJ "logically reasoned" that ability to engage in daily activities including chores and exercises is "inconsistent with [the claimant's] statements of excruciating pain and her inability to perform . . . regular movements"); *Owens v. Kijakazi*, No. 22-1273, 2023 WL 2344224, at *4 (4th Cir. Mar. 3, 2023) (finding no error in the ALJ considering claimant's "own testimony regarding her activities and abilities," including that "[s]he bathes and grooms herself, takes her medications, and prepares simple meals[,] drives her car, shops in stores, and visits with her four grandchildren on the weekends").

Fifth, the ALJ did not deny that Thomas was impacted by his medical conditions and chronic pain. Instead, the ALJ largely credited Thomas' testimony by finding that he was much more limited than suggested by the consultative examiner and state agency medical experts and limiting him to a reduced range of light work. (Tr. 22, 26, 1391-92, 107-08, 120-21.) But the ALJ was not required to find Thomas was symptom-free or experiencing no discomfort to find him not disabled. *See Hines*, 453 F.3d at 565, n.3 ("[A] claimant's allegations about her pain . . . need not be accepted to the extent they are inconsistent with available evidence . . . ."); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (endorsing that an individual need not be pain-free to work).

Thomas' objections to the contrary are not persuasive. He cites the ruling in *Oakes v. Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) for the proposition that the ALJ could "'rely exclusively on subjective evidence in proving that [his] symptoms . . . prevented [him] from working." Docket Entry 11 at 6-7 (brackets and ellipsis omitted). But this does not mean the ALJ erred by considering objective medical evidence in analyzing the intensity, persistence, and limiting effects of his symptoms.

The Fourth Circuit has "reiterate[d] long-standing [Circuit] law . . . that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 98 (4th Cir. 2020). But many long-standing cases, such as *Craig* and *Hines* (among others), clarify that

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available

> evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

*Craig*, 76 F.3d at 595; *see also Hines*, 453 F.3d at 565, n.3 (quoting *Craig*, 76 F.3d at 595).

In other words, under the appropriate circumstances, an ALJ *may* choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms. However, *Oakes*, *Arakas*, *Craig*, and *Hines* do not *compel* ALJs to consider only subjective evidence. Such a requirement would conflict with both the Act and its implementing regulations, which require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. *See* 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether [an] individual is under a disability."); *see also* 20 C.F.R. § 416.929(a)-(c) (directing ALJs to consider a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions, in assessing intensity of a claimant's symptoms).

Courts have long maintained a distinction between a lack of objective medical evidence and inconsistency with the objective medical evidence. *See Chavis v. Colvin*, No. 1:11CV771, 2013 WL 7853486, at *9 (M.D.N.C. Mar. 4, 2013) ("[T]he ALJ did not discount Plaintiff's complaints of pain *solely* because of a lack of objective medical evidence. Rather, one reason the ALJ discounted Plaintiff's complaints in part was because the medical evidence of record *contradicted* Plaintiff's allegations."); *Robles De Nunez v. Comm'r of Soc. Sec.*, No. 1:21-CV-00618-SAB, 2023 WL 2839741, at *17 (E.D. Cal. Apr. 7, 2023) ("The distinction between medical evidence simply failing to support a plaintiff's testimony and medical evidence being inconsistent is critical because the latter may qualify as a . . . reason to reject a plaintiff's testimony while the former does not.") (citation omitted); *see also Craig*, 76 F.3d at 595 ("Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the

claimant alleges she suffers . . . .”).

Here, unlike in *Oakes*, the ALJ acknowledged Thomas' subjective complaints and properly compared them against his longitudinal treatment history, the findings documented by treating and examining physicians, the consultative examiner's opinion, the state agency experts' assessments, and the non-medical evidence, including Thomas' daily activities. (Tr. 22-27.) Because the ALJ properly considered Thomas' symptoms in light of all available evidence of record, there was no error. *See, e.g.*, *Yesenia G. v. O' Malley*, No. 1:23-cv-308, 2024 WL 4367182, at *6 (M.D.N.C. Sept. 30, 2024) (distinguishing *Oakes* because “the ALJ did not rely upon the absence of objective evidence alone to discount Plaintiff's symptoms,” and instead “cited Plaintiff's conservative treatment, her symptomatic improvement when compliant with treatment, and her continuing ability to perform a variety of daily activities”); *Ellis v. Kijakazi*, No. 5:23-cv-332-RN, 2024 WL 3373510, at *10 (E.D.N.C. May 23, 2024) (affirming where ALJ's analysis demonstrated she “formulated the RFC based on both [the claimant's] subjective statements along with the objective medical evidence”).

Thomas also challenges the ALJ's analysis by summarizing why his subjective complaints were fully consistent with the evidence. Docket Entry 11 at 5-9. But even if portions of the record could have allowed the ALJ to make a different finding, the substantial evidence standard does not demand that all the evidence align. “‘Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.'” *Drumgold v. Commissioner*, 144 F.4th 596, 605 (4th Cir. 2024) (citations omitted). The fact that Thomas (or the Court) could view the evidence differently is an insufficient basis to invalidate the ALJ's decision. In other words, “[t]he substantial evidence standard ‘presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.” *Dunn*, 607 F. App'x at 266. Here, the ALJ pointed to more than substantial evidence showing why Thomas did not suffer disabling pain. No more is required. For all these reasons, Thomas' first objection has no merit.[2]

[2] Thomas limits his objection to allegations of pain resulting from his physical condition, Docket Entry 11 at 5-9, and so the Court has limited its analysis to the same. However, the ALJ's assessment of Thomas' mental health impairments also provides good reasons for partially discounting his subjective complaints in that domain as well. *See infra* Part E.

C. The ALJ's Migraine Assessment Is Legally Correct and Well Supported.

Nor is there any merit to Thomas' next objection that the RFC finding is flawed because the ALJ did not include (or explained why he excluded) absences, off-task time, additional breaks, or limitations on the quality and quantity of light and noise exposure. Docket Entry 11 at 9-15. Instead, the ALJ reasonably accounted for Thomas' migraines in the RFC finding by limiting him to light work with postural, reaching, environmental, and mental limitations. (Tr. 22.) The ALJ's RFC is supported by substantial evidence and is sufficiently explained to permit meaningful judicial review.

More specifically, the ALJ acknowledged Thomas' testimony that "[h]e experiences frequent migraines, which typically come in clusters. He can go a week or two with no headaches, and then will have multiple migraines. The migraines last for about an hour if he takes medication." (Tr. 23.) However, as the ALJ discussed, the medical evidence showed that Thomas' migraines were "mostly controlled with medication." (Tr. 574 (9/11/2023 "To treat the headache pain abortively, he is using sumatriptan 100 mg. He is using this medication about 2 times a week. It is helpful to reduce the intensity and will abort the headache pain on most occasions.").); 2882 (7/11/2024 ("He had been on multiple medications which he said he decided to stop using months ago and says that he actually feels better overall off of the medications. The only medicines that he is currently using is Imitrex when needed for migraine headache and pantoprazole for acid reflux. . . . He also is asking for prescription for promethazine to have available to use for nausea that he sometimes gets in association with his migraine headaches.").)

Indeed, as the ALJ pointed out, in September 2023, Thomas "was only using medication approximately twice per week and reported that the medication helped to reduce or 'abort' the pain on most occasions." (Tr. 25, 574.) And, "[i]n July 2024, the claimant reported that he was only using his migraine medication 'when needed'." (Tr. 25, 2881-82.) The ALJ reasonably relied on this treatment evidence showing that medications mostly alleviated Thomas' migraine symptoms to conclude additional RFC limitations were unwarranted. (Tr. 25.) *See Gross*, 785 F.2d at 1166 ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").

The ALJ's analysis of Thomas' migraines was further supported by the medical opinion of consultative examiner Nurse Conrad and the prior administrative medical findings of four state agency reviewing

medical/psychological experts. (Tr. 26-27.) Those sources found that Thomas could perform a range of medium, unskilled work with no need for off-task time or work absences. (Tr. 26-27, 102-11, 116-23, 1392 93.) Thomas, for his part, did not offer any contrary medical opinion suggesting that his migraines caused work-related limitations, and the ALJ was "entitled to rely not only on what the record says, but also on what it does not say." *Lane v. Comm'r of Soc. Sec.*, 100 F. App'x 90, 95 (3d Cir. 2004) (unpublished) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983)); *see also Tutwiler v. Kijakazi*, 87 F.4th 853, 860 (7th Cir. 2023) ("The lack of an opposing medical opinion makes it difficult for us to find that the ALJ misjudged the evidence so significantly as to warrant reversal.").

The non-medical evidence showing that Thomas continued to perform a host of daily activities independently, such as driving, preparing meals, riding a motorcycle, shopping in the store, attending church, and performing household chores, further supported the ALJ's analysis. (Tr. 24, 26, 316-17, 1584, 2802, 574, 1391.) The ALJ reasonably found that "[t]his level of activity is consistent with the above medical record and suggests that the claimant's impairments may not be as debilitating as he alleges." (Tr. 26.)

After carefully considering the relevant evidence, the ALJ then adequately explained that greater RFC limitations were unwarranted: "[t]aken as a whole, the record does not demonstrate that the limitations resulting from the claimant's impairments are totally work preclusive, or greater than provided in the above residual functional capacity assessment." (Tr. 26.) In short, the ALJ provided sufficient explanation, supported by substantial evidence, for his fact-finding about the migraines and resulting RFC limitations.

Thomas' arguments to the contrary are not persuasive. Docket Entry 11 at 9-15. For example, he has not credibly demonstrated that the ALJ mischaracterized the record or ignored probative evidence. *Id.* Nor does he identify evidence that compelled a different finding about his migraine complaints. *Id. See Nasrallah v. Barr*, 590 U.S. 573, 584 (2020) (holding that the claimant must show not only that a reasonable adjudicator could find otherwise, but that a "reasonable adjudicator would be compelled to conclude to the contrary"). Rather, he invites the Court to reweigh the evidence and substitute its judgment for that of the ALJ, which is inappropriate. *Drumgold*, 144 F.4th at 605 (concluding that the court "won't Monday morning-quarterback the decision unless it is exceptionally clear that the ALJ made a mistake.") (internal quotation marks and citation omitted); *Keene v. Berryhill*,

732 F. App'x 174, 177 (4th Cir. 2018) (unpublished) ("There were a number of conflicts in the evidence here, and we do not second guess the ALJ in resolving those conflicts. In our view, the justification provided by the ALJ—albeit somewhat sparse—was sufficient to allow us to determine that the ALJ performed an adequate review of the whole record and that the decision is supported by substantial evidence.").

To the extent Thomas claims the ALJ should have explained in greater detail why off-task time, absenteeism, or other limitations were omitted from the RFC, he demands more than the law requires. Docket Entry 11 at 13-15. Instead, "the RFC 'assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" *Monroe*, 826 F.3d at 189. The ALJ must also "build an accurate and logical bridge from the evidence to [the] conclusion." *Brown*, 873 F.3d at 269. As demonstrated at length above, the ALJ met this standard here.

Thomas' reliance on the unpublished case of *Woody v. Kijakazi*, No. 22-1437, 2023 WL 5745359 (4th Cir. Sept. 6, 2023), is misplaced. In *Woody*, the Fourth Circuit based its remand on the fact that, "although [the plaintiff] told her physicians the severity of her headaches had lessened with treatment, the record d[id] not establish whether her headaches nevertheless remained severe enough to cause her to be absent from work when they occurred." *Id.* at *1. The Fourth Circuit required "a clearer window into [the ALJ's] reasoning." *Id.*, n. 1 (citation omitted).

Here, there is no ambiguity about the impact of the claimant's alleged headaches on the ability to work. *See Christina W. v. O'Malley*, No. 1:23CV883, 2024 WL 4266681, at *8 (M.D.N.C. Sept. 23, 2024) (finding *Woody* distinguishable where it was clear from the ALJ's findings "why [she] did not include greater limitations in the RFC, including absence"). The ALJ gave numerous reasons as to why Thomas' migraines were not disabling, not the least of which was the fact that pain management successfully treated them. In fact, the record shows, just as the ALJ articulated, a lack of ongoing functional limitation related to migraines during the period under review. (Tr. 22-27.)

The ruling in *Porterfield v. Berryhill*, No. 1:18-cv-319-TDS-JLW, slip op. (M.D.N.C. Aug. 6, 2019) is also inapposite. Docket Entry 11 at 13. In *Porterfield*, "[w]hat [was] missing [was] an adequate analysis that meaningfully explains how the ALJ reconciled the conflicting evidence on record." *Id.* at 7. Here, the ALJ's

rationale is reasonably discernable, well-supported, and legally correct, and nothing more is required.[3]

D. The ALJ Did Not Materially Err by Including a Production Pace Limitation in the RFC.

Last, Thomas contends that "[t]he ALJ erred by failing to explain what the term 'production rate pace' means in the RFC assessment." Docket Entry 11 at 12-17. For the following reasons, this objection warrants no relief.

First, despite faulting the ALJ for not saying more about the meaning of the term "production rate pace" in his decision, Thomas (through counsel) failed to cross-examine the vocational expert ("VE") regarding the specific meaning of that non-production restriction despite extensively questioning the VE on numerous other issues. (Tr. 58, 61-63.) As a result, Thomas has forfeited his challenge to the sufficiency of the ALJ's non-production restriction. *See Jenna S. v. Dudek*, No. 1:24CV383, 2025 WL 723609, at *5 (M.D.N.C. Mar. 6, 2025) (collecting cases); *Shaw v. Kijakazi*, No. 1:20CV581, 2021 WL 3079905, at *8 (M.D.N.C. July 21, 2021) ("[A]t the hearing before the ALJ, Plaintiff failed to question the VE regarding the meaning of the phrase 'production rate pace' or how the jobs the VE cited adhered to that restriction, despite the fact that he had the opportunity (through his attorney) to cross-examine the VE."); *Stepinski v. Astrue*, No. CA 11-183 ML, 2012 WL 3866678, at *10 (D.R.I. Aug. 6, 2012) ("The Court views unfavorably the silence of Plaintiff's counsel at the hearing regarding the omission about which he now complains."). Similarly, the VE did not express any difficulty in understanding the meaning of the words "production rate pace" in responding to the ALJ's dispositive hypothetical question. (Tr. 58-63.)

Second, even if this objection had not been forfeited, it would fail on the merits. In *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019), the Fourth Circuit found that an RFC limitation prohibiting work "requiring a production rate or demand pace" did not provide "enough information to understand what those terms mean." *Id.* Accordingly, the Fourth Circuit held that, "[w]ithout further explanation," it would not determine "whether the RFC finding—particularly the portion

[3] To the extent Thomas suggests the ALJ erred in pointing out that a July 2024 CT scan showed no acute intracranial abnormality, Docket Entry 11 at 11 citing Tr. 25, objective medical evidence is relevant under SSR 19-4p. And while migraines generally may not be detectable through objective testing or physical examinations, the ALJ here gave good reasons as to why additional migraine related limitations were unnecessary.

restricting Thomas to jobs that do not require a 'production rate' or 'demand pace"—properly account[ed] for Thomas's moderate limitations in concentration, persistence, and pace." *Id.* at n.5; *see also Perry v. Berryhill*, 765 F. App'x 869 (4th Cir. 2019) (unpublished) (finding that the failure to define the term "non-production oriented work setting" precluded meaningful review).

Since then, the Fourth Circuit has affirmed cases with RFCs that limit claimants to work at a non-production pace. *See*, *e.g.*, *King v. Berryhill*, No. 3:18CV1, 2019 WL 1317732, at *2 (W.D.N.C. Mar. 22, 2019) ("non-production pace"), *aff'd sub nom. King v. Saul*, 787 F. App'x 170 (4th Cir. 2019); *Michaels v. Colvin*, No. 3:15CV388, 2016 WL 8710975, at *1, 7 (W.D.N.C. Mar. 25, 2016) ("nonproduction pace rates"), *aff'd sub nom. Michaels v. Berryhill*, 697 F. App'x 223 (4th Cir. 2017). Moreover, *Thomas* and *Perry* "did not create a categorical rule that failing to define certain terms constitutes a reversible error," *Taylor v. Saul*, No. 3:19CV468, 2020 WL 4340536, at *6 (E.D. Va. July 27, 2020), but, rather, "clarified that a reviewing court's ability to understand phrases such as 'production rate of pace' in an ALJ's opinion depends on the phrase's context and use," *Katherine M. A. v. Saul*, No. 3:19CV649, 2021 WL 1207739, at *10 (E.D. Va. Feb. 2, 2021).

As another judge of this Court reasoned:

> In [*Perry*], the Fourth Circuit specifically distinguished its decision in *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017), where it found that an ALJ had adequately explained a[n RFC] assessment that restricted the claimant, in part, to non-production jobs, as the ALJ in *Sizemore* provided additional context ... which descriptors helped to explain the restriction intended by the ALJ, and allowed [the Fourth Circuit] to evaluate whether that restriction adequately accounted for the claimant's limitations.

*Ross v. Berryhill*, No. 1:17CV1145, 2019 WL 1430129, at *1 (M.D.N.C. Mar. 29, 2019) (cleaned up) (alterations in original).

Here, the instant matter is factually inapposite from *Thomas* and *Perry*. The ALJ in this case did not use the phrase "production rate or demand pace" as seen in *Thomas* or "non-production oriented work setting" as seen in *Perry* but, rather, concluded that Thomas could perform work "not at a production rate pace." (Tr. 22.) A nearly identical phrase can be found in the definition of light work in the *Dictionary of Occupational Titles* ("DOT"):

> [A] job should be rated [l]ight [w]ork . . . when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

*DOT*, App'x C ("Components of the Definition Trailer"), § IV ("Physical Demands - Strength Rating"), 1991 WL 688702.

Similarly, the Social Security Programs Operation Manual System (POMS) Medical and Vocational Quick Reference Guide likewise explains that:

> The Department of Labor rated an occupation as light when it requires walking or standing to a significant degree, sitting most of the time while pushing or pulling arm or leg controls, or working at a *production rate* while constantly pushing or pulling materials even though the weight of the materials in these situations is negligible.

POMS DI 25001.001(A)(43) Medical and Vocation Quick Reference Guide, *available at* https://secure.ssa.gov/poms.nsf/lnx/0425001001 (emphasis added).

All this shows "not at a production rate pace" is a term of art describing constant movement or engagement. Judges in this Court and at least one other have found the DOT provides the clarity for "production rate pace" that was missing from the language at issue in *Thomas*. *See Wood v. Comm'r*, No. 1:20-cv-231-GCM-DCK, 2022 WL 18635520, at *8 (W.D.N.C. Sept. 21, 2022); *Shaw*, 2021 WL 3079905, at *7 *recommendation adopted*, 2021 WL 6202788 (M.D.N.C. Aug. 23, 2021). As a sister district court has noted, "'production rate pace' is a phrase subject to a common understanding, such that it need not be separately defined to be evaluated appropriately by a vocational examiner." *Crocetti v. Comm'r*, No. CV SAG-17-1122, 2018 WL 3973074, at *1 (D. Md. Aug. 1, 2018).

The term used here is essentially the same. Thus, when the ALJ concluded that Thomas could perform work "not at a production rate pace," his meaning was clear: Thomas could do work that does not demand constant production. And the ALJ provided the further descriptors that "the claimant can understand, remember and carry out simple instructions for 2 hour intervals over an 8-hour workday, but

not at a production rate pace, such as a strict, hourly production quota." (Tr. 22.) Those descriptors "help[] to explain the restriction intended by the ALJ." *Perry*, 765 F. A'ppx at 872 n.1; *see Matthew S. v. Colvin,* No. 1:23CV991, 2024 WL 5245155, at *6 (M.D.N.C. Dec. 30, 2024) (descriptors allowed meaningful review of ALJ's use of term "not a production pace"); *Ricky F. v. O'Malley*, No. 1:23CV720, 2024 WL 4333136, at *7 (M.D.N.C. Sept. 27, 2024) (same, as to the term "production pace"); *Shaw*, 2021 WL 3079905, at *1, 7 (same, as to the term "production rate pace"), *recommendation adopted*, 2021 WL 6202788; *see also Gravel v. Kijakazi*, No. 5:21-CV-178-KDB, 2022 WL 3008437, at *3 (W.D.N.C. July 28, 2022) (same, as to the term "non-production workplace setting"). *See also Ross*, 2019 WL 1430129, at *1 ("[T]he ALJ here provided the necessary 'descriptors,' limiting Plaintiff to 'a low stress, low production environment with no rigid quota and occasional exposure to people[.]'").

Even additional descriptors that do not directly modify the non-production restriction can allow for meaningful review if they provide important context. *See Matthew S.*, 2024 WL 5245155, at *6 ("[T]he ALJ here included the descriptors of 'simple, routine tasks,' 'simple work-related decisions,' only 'occasional changes in the workplace setting,' 'no complex decision making,' only occasional interaction 'with supervisors and coworkers,' and no interaction 'with the public.' Those descriptors help[ ] to explain the restriction intended by the ALJ.") (internal citations omitted); *Ricky F.*, 2024 WL 4333136, at *5 ("simple routine tasks and simple work related decisions," "occasional changes in the workplace setting," and "frequent [interaction] with supervisors and coworkers but never with the public"); *Shaw*, 2021 WL 3079905, at *1, 7 (concluding that remand was not required where the ALJ found that the claimant was "limited to simple, routine and repetitive tasks . . . simple work-related decisions; occasional interaction with the public; and frequent interaction with co-workers and supervisors" but not at a "production rate pace").

Thus, there "production rate pace, such as a strict, hourly production quota" restriction (Tr. 22) shielded Thomas from "always perform[ing] certain work tasks within a time allotment." *See Christopher J. v. O'Malley*, No. 1:23CV743, 2024 WL 3400525, at *6 (M.D.N.C. July 12, 2024) (affirming RFC determination limiting claimant to "no production-pace or quota-based work"). Moreover, the ALJ also included the descriptor of "simple instructions for 2 hour intervals over an 8-hour workday." (Tr. 22). All this "helps to explain the restriction intended by the ALJ." *See, e.g.*, *Perry*, 765 F. App'x at

872 n.1.

Third, even assuming the ALJ erred by not providing additional explanation about the meaning of the production pace limitation, the error is harmless. This is because the ALJ relied on at least two jobs at step five that do not involve a production setting. Consequently, the production limitation was in practical effect irrelevant to the ALJ's ultimate decision and thus would be harmless error. *See*, *e.g.*, *Ricky F.*, 2024 WL 4333136, at *7 n.6.

More specifically, at step five, the ALJ identified three jobs that Thomas remained capable of performing despite his impairments: (1) marker, DOT 209.587-034, 1991 WL 671802,[4] (2) sales attendant, DOT 299.677-010, 1991 WL 672643,[5] and (3) routing clerk, DOT 222.687-022, 1991 WL 672133 (Tr. 28.)[6] Nothing in the DOT job descriptions for the marker and sales attendant jobs suggests that the jobs in question involve "production" work, nor does Thomas state otherwise. *See also*, *e.g.*, *Christopher J*, 2024 WL 3400525, at *4 (finding no basis for remand where

[4] Marker, DOT 209.587-034, 1991 WL 671802 ("Marks and attaches price tickets to articles of merchandise to record price and identifying information: Marks selling price by hand on boxes containing merchandise, or on price tickets. Ties, glues, sews, or staples price ticket to each article. Presses lever or plunger of mechanism that pins, pastes, ties, or staples ticket to article. May record number and types of articles marked and pack them in boxes. May compare printed price tickets with entries on purchase order to verify accuracy and notify supervisor of discrepancies. May print information on tickets, using ticket-printing machine [TICKETER (any industry); TICKET PRINTER AND TAGGER (garment)].").

[5] Sales Attendant, DOT 299.677-010, 1991 WL 672643 ("Performs any combination of following duties to provide customer service in self-service store: Aids customers in locating merchandise. Answers questions from and provides information to customer about merchandise for sale. Obtains merchandise from stockroom when merchandise is not on floor. Arranges stock on shelves or racks in sales area. Directs or escorts customer to fitting or dressing rooms or to cashier. Keeps merchandise in order. Marks or tickets merchandise. Inventories stock.").

[6] Because it "may" involve a conveyor belt, the Court removes this job from its analysis in an abundance of caution. Routing Clerk, DOT 222.687-022, 1991 WL 672133 ("Sorts bundles, boxes, or lots of articles for delivery: Reads delivery or route numbers marked on articles or delivery slips, or determines locations of addresses indicated on delivery slips, using charts. Places or stacks articles in bins designated according to route, driver, or type. *May be designated according to work station as Conveyor Belt Package Sorter* (retail trade). May sort sacks of mail and be known as Mail Sorter (r.r. trans.).") (emphasis added).

the VE "provided three jobs that fit within the ALJ's non-production restriction" including marker, and noting that "[n]one of those *DOT* descriptions would compel the Court to find that those jobs actually involved production-pace or quota-based work"); *Ashley A.F. v. O'Malley*, No. 1:22CV983, 2024 WL 345733, at *12 (M.D.N.C. Jan. 30, 2024) (holding that the position of marker and photocopying machine operator "fit within the ALJ's non-production restriction"); *Spurlock v. Berryhill*, No. 1:17CV411, 2018 WL 791302, at *7 (M.D.N.C. Feb. 8, 2018) (finding no conflict between the position of marker and a limitation to no high production demands).

Moreover, there are approximately 165,000 marker jobs and 146,000 sales attendant jobs nationally. (Tr. 28.) Consequently, even if only one of these jobs occurred in a production environment, there would *still* be enough jobs in the remaining position to support the ALJ's step five finding with substantial evidence. *See, e.g.*, *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (110 jobs constitute a significant number).

In short, this objection has been forfeited, is without substantive merit, and at best could demonstrate no more than harmless error. For all these reasons, it is overruled.

E. Thomas' Objection to the Contrary Is Not Persuasive.

Thomas' reliance on a recent unpublished Fourth Circuit case, *Linger v. Comm'r of Soc. Sec.*, No. 22-2192, 2025 WL 40548 (4th Cir. Jan. 7, 2025), does not change the calculus because the facts are not on point. Here, Thomas "had limited psychological treatment during this period and there is no indication that he has sought or required inpatient care or psychiatric hospitalization." (Tr. 26.) His mental status findings were largely "unremarkable" and showed that "he remained fully oriented, and exhibited average intelligence, linear, logical, and goal directed thought processes, and 'fair' or 'appropriate' insight and judgment." (Tr. 25, 2438, 2462-63, 2488, 2508, 2531, 2555, 2582, 2673; Tr. 26.) He also "appear[ed] alert, fully oriented, and display[ed] normal attention and concentration" during his physical examinations. (*See, e.g.*, Tr. 25, 575.) Moreover, Thomas reported improvement with medication management. (Tr. 25-26, 2660, 2670, 2505, 2591.) The state agency psychological experts both found Thomas could perform a range of simple work (Tr. 27, 109-11, 121-23), and no medical sources suggested he had work-preclusive mental limitations. In addition, Thomas engaged in a variety of daily living activities discussed earlier in this order, including riding his motorcycle. (Tr. 26.)

Linger, in contrast, had a full-scale IQ

of 60; two medical sources opined that he had marked mental limitations; a former coworker reported that he could not perform simple tasks and frequently needed help while working as a laborer; he needed his mother's help to perform certain activities; and he had trouble articulating his medical history before the ALJ. *See Linger*, 2025 WL 40548, at *2-3. Based on this evidence, the Fourth Circuit found that the ALJ failed to support his findings with substantial evidence. *Id.* Consequently, the Fourth Circuit reversed and remanded the case. *Id.*

More specifically, as to the RFC determination, the ALJ in *Linger* did not address the claimant's ability to perform tasks for the full workday, did not explain how the identified limitations addressed the claimant's mental limitations in two functional areas, and did not define "no fast paced production requirements." *Id.* (quotation marks omitted). Additionally, the *Linger* panel concluded that there was insufficient evidence to support the Agency's factual determinations, the ALJ gave too little weight to medical opinions, failed to reconcile conflicting evidence, or explain how the ability to carry out daily activities translated into the ability to work a full day. *Id.* at *6. The *Linger* panel also concluded that the phrase "no fast paced production requirements such as assembly line work or piecemeal quotas" engendered "uncertainty as to the intended scope of the limitation." *Id.* at *4, 5.

There was no uncertainty here. The ALJ determined that Thomas "can understand, remember and carry out simple instructions for 2 hour intervals over an 8-hour workday, but not at a production rate pace, such as a strict, hourly production quota" and included this limitation in a hypothetical question to the VE. (Tr. 58.) No one—not the ALJ, the VE, or Thomas' counsel—expressed confusion about the meaning of the phrase. (Tr. 58-64.)

This limitation is not too ambiguous to preclude meaningful review. And *Linger* does not compel a different conclusion. *See Autumn C. v. Bisignano*, No. CV EA-25-1592, 2026 WL 2042105, at *2-3 (D. Md. July 15, 2026) (describing a split in persuasive authorities, analyzing *Linger*, denying a motion for reconsideration, and ultimately affirming an RFC restriction "limited to simple, routine, and repetitive tasks in an environment where [the claimant] is not expected to perform work requiring a specific production rate, such as assembly-line work or work that requires hourly quotas"); *Jennifer G. v. Bisignano*, No. CV EA-25-2678, 2026 WL 2279330, at *5 (D. Md. Aug. 7, 2026) (relying on *Autmn C.* and finding no lack of clarity in RFC limiting claimant in pertinent part to "perform[ing] work without a specific production rate pace, such as an

assembly line or hourly production quotas").

Thomas proffers his subjective opinion that the ALJ's preclusion of production pace and quota-based work "could" limit him to "a sheltered, non-competitive (and thus non-substantial gainful activity) job," Docket Entry 11 at 16-17 (citing 20 C.F.R. § 404.1573(c)). But both the VE, in testimony, and the DOT maintain that there is a significant number of competitive jobs that accommodate the ALJ's production and quota restrictions, *see Christopher J*, 2024 WL 3400525, at *6; *see also Nace v. Colvin*, No. EDCV 14-641, 2015 WL 2383833, at *9 (C.D. Cal. May 18, 2015) ("[The p]laintiff's personal opinion is not a reliable source of job information, and she cites no legal authority for her contention that the [c]ourt should overlook the two designated sources of reliable job information in this case—the [DOT] and the VE's testimony—in favor of [the plaintiff's] own subjective beliefs.").

Finally, even assuming *arguendo* that *Linger* applied to the facts here, Thomas' objection would still fail. He forfeited the objection. And any error would be harmless because one or more of the jobs the ALJ concluded that Thomas could perform exist in significant numbers in the national economy. In fact, the VE in this matter pointed to three *more* jobs that existed in significant numbers in the national economy that someone with Thomas' RFC could perform if *even more* restrictions were added. This included the jobs of document preparer, DOT, 249.587-018, 1991 WL 672349; escort vehicle driver, DOT 919.663-022, 1991 WL 687886; and furniture rental consultant, DOT. 295.357-018, 1991 WL 672589. (Tr. 58-59, 61.) These jobs do not take place in a production environment and VE testimony shows that they exist in significant numbers in the national economy. *See id*. The VE thus pointed to at least five jobs that do not occur in a production environment and which exist in substantial numbers. Consequently, even assuming the ALJ erred here in not further defining the production pace limitation, Thomas was not prejudiced.

For all of these reasons, Thomas' final objection has no merit.

V. CONCLUSION

After careful consideration of the evidence of record, the Court finds that the Commissioner's decision is legally correct, supported by substantial evidence, and susceptible to judicial review.

Accordingly, IT IS HEREBY ORDERED that the final decision of the Commissioner is upheld.

JoAnna Gibson McFadden
United States Magistrate Judge

September 29, 2026